## PROOF OF A TRANSFER OF CORPORATE STOCK.

### Superior Court of Cincinnati.

### JOHN M. RUSSELL, ADMINISTRATOR, v. THE FOURTH NATIONAL BANK.

#### Decided, 1916.

*Corporations—Admissibility of Entries in Stock Ledger—For Purpose of Showing Transfer of Stock—Possession of Certificate, Unendorsed, Not Conclusive Evidence of Ownership—Waiver of Provision for Endorsement and Surrender May be Inferred, When.*

1. Entries, in the stock ledger of a bank of the purchase and sale of bank stock by a one-time stockholder, shown to have been made in pursuance of duty by a deceased clerk, are admissible upon the issue of title to the stock. The admissibility of such entries rests upon the probability of truth in a contemporaneous and regular record, and is not destroyed by the circumstance that the entries are or may become self-serving in character.

2. The possession of a certificate of stock, transferable only by endorsement and surrender, is *evidence* of ownership of the stock described, but such evidence is not conclusive of ownership. The stipulation for endorsement and surrender of the certificate, before transfer of the stock, may be mutually waived by the corporation and the stockholder, and such waiver will be inferred from a regular entry of such transfer in the stock ledger of the corporation, taken in connection with circumstances which make any other inference highly improbable.

3. R in 1865 became the owner of 30 shares of stock of defendant bank, evidenced by stock certificate; for two years he received dividends on the stock, but from 1867 till his death in 1895 he collected no dividends, though dividends were declared semi-annually, and he failed to vote at stockholders' meetings. He suffered a financial decline and died leaving no visible estate. Seventeen years after his death, and forty-five after he was last known as a stockholder of defendant bank, the original certificate, unendorsed, was found among his papers. The certificate provided on its face that the stock was transferable only on the books of the bank upon surrender of the certificate properly endorsed.

The bank records for the period in question are lost or destroyed, save for an old "stock ledger" wherein, in 1865, R is credited with the purchase of 30 shares of stock, and in 1867 is charged with the sale thereof to one "C."

It appearing that the stock ledger was in the handwriting of a clerk
       or cashier, now deceased, and that it was the duty of the clerk
       to keep such record,
Held, the ledger entries are admissible on the issue of ownership.

   Tuttle & Ross, for plaintiff.
   Charles B. Wilby, William Worthington and Clark Wilby,
contra.

   MERRELL, J.

   This case, important in itself, has added interest because it
has already been twice reported. The view of this court upon
the first trial appeared in 15 N.P. (N.S.), 184, and the converse
conclusion of the court of appeals is found in 23 C.C. (N.S.), 1.

   Plaintiff seeks to be recognized as the owner of thirty shares
of stock in the defendant bank, and to have a certificate there-
for, standing in the name of his intestate, transferred to himself
as administrator, or, in the alternative, an accounting for the
value of such stock and the dividends declared thereon.

   The defendant pleads various defenses, which need not be
detailed, and by way of cross-petition prays that the certificate
of stock in plaintiff's hands be ordered surrendered for cancel-
lation.

   The facts are in outline as follows:

   In 1865 plaintiff's intestate became the owner of thirty shares
of stock of the Fourth National Bank, evidenced by stock certifi-
cate No. 123, bearing upon its face a provision that the stock
was transferable only on the books of the company upon a sur-
render of the certificate properly endorsed. This provision cor-
responded to a by-law of the bank of the same tenor. For two
years plaintiff's intestate received the dividends declared upon
this stock, but thereafter, although he continued to live in the
city of Cincinnati until the year 1888, he received no dividends,
did not attend or vote at meetings of the stockholders, nor did
he in any way conduct himself or appear as the owner of valu-
able holdings in the Fourth National Bank or any other insti-
tution. During the period of his residence in Cincinnati after
1867, plaintiff's intestate engaged in several business enter-
prises, none of which seems to have prospered. In fact, the
evidence indicates that he suffered a financial decline until in

1888 he removed with his family to Oregon. In his western home he appears to have had little or no means, and at his death in 1895 he left no apparent estate whatsoever. After January, 1867, as appears from the books of record of the Fourth National Bank, the bank recognized W. F. Colborn as the owner of the thirty shares of stock originally held by Russell, and from that time until the present Colborn or his assignees have received dividends declared upon the stock and have voted at stockholders' meetings.

Although, as has been said, Russell in 1895 left apparently no estate, yet in 1912 his son, looking through some of his father's papers in a tin box in the home at Portland, Oregon, found the original certificate No. 123 of the stock of the Fourth National Bank. Aside from this stock certificate the tin box contained no papers of any real value.

Leaving aside all other facts in evidence and assuming for the moment that Russell from 1867 until his death continued to be the owner of thirty shares of Fourth National Bank stock, the extraordinary situation is presented of a man in possession of all his faculties, burdened with family and business responsibilities without adequate means of meeting them, concealing or forgetting for twenty-eight years such a valuable property as this holding of stock in a prosperous national bank.

The certificate of stock is admittedly genuine. It has never been transferred by endorsement upon the reverse of the certificate and there is no living witness who can tell of his own knowledge or even by hearsay what, if anything, was done by Russell with respect to this stock in the year 1867 or at any time thereafter. During the years that followed 1867 the bank declared and paid dividends upon all its stock twice each year, saving one or two short intervals. At certain times during this period, that is, during the period that Russell lived in Cincinnati, notices of annual meetings, also notices of the declaration of dividends were published in Cincinnati newspapers. Omitting certain details of evidence which at best can only throw sidelights upon the situation, the foregoing are the now available facts presented, unless certain entries and particularly one entry in an old stock ledger of the Fourth National Bank can be

permitted some evidential force. This stock ledger, a book of original entry, is the only bank record of the period that has survived destruction or loss.

At the former trial of this cause the stock ledger was received in evidence as to the account in the name of J. N. Russell, and in this account there appeared two entries—one in 1865 charging the bank with the issuance of thirty shares of stock to Russell, and the other in 1867 crediting (as it were) the bank in a like amount and debiting Russell. By other notations in the bank's ledger of that period, the last entry can be traced into the purported issue of the same thirty shares of stock to one W. F. Colborn. At the former trial there was an intimation that Colborn was at that time an officer of the Fourth National Bank, but upon the present trial this misconception has been cleared up, it appearing affirmatively that Colborn was not an officer or director of the bank at the time. In deciding the case as a result of the evidence adduced at the first trial, the court obviously was influenced by this entry in the stock ledger which the court of appeals reviewing the case held to be totally inadmissible, saying:

"Colborn, it is said, was at the time a vice-president of the defendant bank. He was dead at the time of the trial and *no witness undertook to say who made these entries in the stock ledger or under what circumstances or by whose or what authority they were made.*"

And later (referring to the ledger entry):

"It is but a statement of an interested party of advantage to the same party and to the decisive disadvantage of the representative of the other party, but who was no party to the transaction which it purports to narrate. * * * Otherwise spoken it is but the self-serving declaration of an interested party, allowed to be used to the detriment of one in no way responsible for, or acquiescent in it, so far as the record shows."

At the present trial the entry in the stock ledger was permitted to be offered in connection with proof of the handwriting and of the fact that the person making the entry was dead, and that the book was one which it was the duty of the entrant to keep. In this connection the court was asked to take notice of

the banking laws of the United States requiring national banks
to keep a record of stockholders as a basis for their annual
report to the Comptroller of the Treasury. Upon the offer of
the stock ledger at this trial, the ruling of the court was held
in abeyance and the admissibility of the offer is now to be
determined.

It is, of course, admitted by counsel for the defendant that
this court is bound by the ruling of the court of appeals which
has established the law of the case upon the record at the first
trial. It is, however, pointed out, as indeed it was made clear
by the court of appeals in the language above quoted, that on
the former record it was not proved who made the entries
in the stock ledger or under what circumstances or by what
authority, nor was there any proof that the entries were made
in pursuance of a duty and in the course of business by a per-
son since deceased. At the present trial, therefore, the admissi-
bility of the stock ledger is contended for under the ''regular
entry'' exception to the hearsay rule, as formulated in *Price* v.
*Earl of Torrington,* 1 Salk., 285, and illustrated in *Doe.* v. *Tur-
ford,* 3 Barnewell & Adolphus, 890, and in a host of English
and American authorities coming down to the present day. At
this point it may serve a purpose to quote briefly from the opin-
ion of Parke, J., in the latter case. The question was whether
a notice to quit served by an attorney and noted by him on a
copy of the notice upon his return to his office was admissible to
prove service. At page 896, Parke, J., said:

''The real question in the case is whether the entry   *   *   *
was admissible in evidence, and I think it was, not on the ground
that it was an entry against his own interest, but because of
the fact that such entry was made at the time   *   *   *   was
one of the chain of facts on which the delivery of the notice to
quit might lawfully be inferred.

''In this point of view it is not the matter contained in the
written entry simply which is admissible, but the fact that an
entry containing such matter was made at the time it purports
to bear date, and when in the ordinary course of business such
an entry would be made if the principal fact to be proved had
really taken place.''

In argument upon the present case it was insisted that the
ledger entry is simply the self-serving declaration of the bank

and is therefore inadmissible. This argument has the apparent sanction of the appellate court which declared—

"it is but the self-serving declaration of an interested party allowed to be used to the detriment of one in no way responsible for, or acquiescent in it, so far as the record shows."

An analysis of the opinion of the court of appeals shows, however, that the latter was not speaking of entries made in the regular course of business, but solely with regard to the fact that Russell's name appeared upon the books of the bank, first as a stockholder and then as having ceased to be a stockholder. The upper court pointedly says:

"The fact, the mere accident, that the statement appears in writing on the books of the concern does not make it any the less a statement or raise it to any force or dignity above a statement, as seems to be mistakenly supposed in some quarters."

The last quotation brings up for consideration the suggestion advanced by the defendant that the bank's record of its own stockholders affords some proof or at least a presumption that Russell, having become the owner of thirty shares of stock in 1865 parted with title to that stock to W. F. Colborn and that thereafter Russell ceased to be a stockholder in the bank. This theory is founded upon the notion that the employees of a corporation are not only its agents, but also the agents of a shareholder as to his relations with the corporation. This view finds support in numerous authorities, notably in *Turnbull* v. *Payson,* 95 U. S., 418, in the head-note of which it is said:

"A person is presumed to be the owner of stock when his name appears on the books of the company as a stockholder; and when he is sued as such, the burden of disproving that assumption is cast upon him."

This decision has been vigorously, and to my mind, justly criticised. The theory underlying it is, of course, that a stockholder is a member of a corporation and as such, is presumed to know what appears in the corporate records. This presumption, which may properly hold in a case between a partnership and a member thereof, does violence to the facts when applied as

between stockholder and corporation. Accordingly, I find myself in entire agreement with the view of the many text-writers and numerous authorities quoted in the brief of plaintiff's counsel, and very concisely put in the case of *Carey* v. *Williams,* 79 Fed., 906, wherein it is said that the books of a corporation—

"are not evidence against a stockholder in respect to a contract entered into by him with the corporation notwithstanding he has access to them, because, as to such a contract, he is regarded, not as a stockholder, but as a stranger."

It was undoubtedly this point of view and this only which the court of appeals had in mind when it declared that "banks are not sacrosanct."

In the present case there is no evidence independent of the entry in the stock ledger itself tending to prove that Russell knew or assented to the transfer of his thirty shares of stock to Colborn. This at least is true if we except Russell's silence for many years and his failure to collect dividends on the stock or to vote at company meetings. Hence upon the facts of the present case I am ready to conclude that the mere fact that the bank's books show a transfer of Russell's stock to Colborn can not be used against the claim of ownership on the part of Russell or his personal representative. This was, in effect, the whole *ratio decidendi* of the court of appeals in their review of the record at the first trial. An expression of this point of view declaring the law of the case as settled by the court of appeals, makes it unnecessary to consider in detail the numerous authorities collected and presented *pro* and *con* this proposition.

In view of what has been said there should be no difficulty in stating the "law of the case" as established by the court of appeals. Clearly that court did not feel that a basis had been laid in the record before it for a consideration of the Russell entries in the stock ledger as entries made in pursuance of duty in the regular course of business by a person since deceased. Even if the upper court had not made its reasoning entirely plain it would be highly presumptuous on my part to conclude that the reviewing court had held that such an entry was not admissible because of its self-serving character, and thereby declared that to be law which for at least a century has never

been law nor thought to be law. It follows, therefore, that what has been said upon the former review of this case does not in the least settle the question of the admissibility of the stock ledger under the "regular entry" or "shop-book" rule, and this question presents itself for the first time upon the present record.

As already indicated in the recital of the evidence, the conditions precedent to the consideration of the stock ledger as a book entry are all present in the case at bar. If the J. N. Russell account properly comes within the account book exception of the hearsay rule, now for the first time, the person who made the entry and his official connection with the bank is identified, as is his handwriting, and it appears to have been the duty of his position and possibly also the statutory duty of the bank to make such entries. The person who made the entry is dead, and from the apparent regularity of the entry it will now be presumed that the entry was contemporaneous with the fact. As to whether the J. N. Russell account in the stock ledger was such a record as properly falls within the exception to the hearsay rule, there may have been at one time much conflict of opinion and perhaps in certain jurisdictions this conflict still exists. Yet at a very early time such entries were held to be within the rule and it is thought that the better modern practice will include such a case. A case closely analogous was that of *Evans* v. *Lake,* Bull. N. P., 282, cited in the opinion of *Doe* v. *Turford,* *supra.* The question there was whether eight parcels of Hudson Bay stock were bought in the name of Lake on his account or in trust for Sir Stephen Evans. To establish the latter position there was admitted a certain "shop-book" of Sir Stephen in the handwriting of his bookkeeper, since deceased, containing an entry of the payment of the money for the whole of the stock. The entry was certainly vital to Sir Stephen's interest, but its self-serving character was thought no impediment to its introduction in evidence. I can not persuade myself that a century after this decision was rendered, the courts of today should be more illiberal in their application of the rules of evidence than the court which first gave form and expression to the rule in question. I therefore conclude that the J. N. Russell account

is, upon the evidence at the present trial, admissible under the "shop-book" rule. This conclusion, it seems almost unnecessary to state, assumes a total absence of independent evidence that Russell knew of the entry or assented to it, the theory being that as the subject-matter of the entry brought it within the line of duty of the person making it, and as after the death of the entrant it will be presumed to have been made contemporaneously, the very existence of the entry is some evidence of the fact which it purports to record.

Before I pass to another phase of the case, something should be said as to the contention of plaintiff's counsel that the admission of such entry as against the personal representative of a deceased person runs counter to the spirit of Section 11495, G. C., providing that "a party shall not testify, when the adverse party * * * is an executor or administrator, etc."

As to this contention, it may be sufficient to suggest that the use of book-account entries is in some instances excepted from the operation of this statute (sub-section 6) and that the disability to testify of a party suing or being sued by an executor or administrator does not extend to the agents of such party. *Cockley Milling Co.* v. *Bonn,* 75 O. S., 270. If the present case is not within the letter of the statute referred to, no disability should be allowed on purely sentimental grounds or following the "spirit" of the statute. Much learned and lachrymose nonsense is spoken in defense of this statutory rule of evidence by eminent persons who forget that this statute is nothing more than a modern remnant of a medieval rule of law which prevented a party from testifying at all in his own case and that the bar of the statute is more often used by clever counsel to defeat a full disclosure of facts than it is to prevent fraud by the living upon the dead.

Having thus solved the question of evidence left in abeyance at the trial in favor of the admissibility of the stock ledger, it is necessary to consider with some care the probative effect of the entry and in so doing to keep in mind the peculiar characteristics and nature of shares of capital stock.

It is commonplace to say that a share of capital stock is but an aliquot portion of all the rights of the corporate entity. It is

a peculiar species of property, commonly evidenced by a certificate of ownership. Such certificate is not stock but merely a token, however important, of title to stock. With this obvious, but sometimes forgotten, distinction in mind, the question may be considered of what force in the present case is the by-law of defendant bank (printed on its stock certificate) reciting that its stock is ''transferable only on the books of the bank   *   *   * upon surrender of this certificate''?

For the defendant it is contended that this provision was primarily for the benefit and protection of the bank, and might be waived by it any time, of course, at its peril; for the plaintiff it is said to be equally for the protection of the stockholder. Both points of view are tenable and perhaps sound. Even so, it is open to both the corporation and a stockholder to waive jointly their respective protections. To hold otherwise would be to confuse the stock and the certificate representing it.

In the present case there is no direct proof of such mutual waiver, and only, through the stock-ledger, inferential proof.

The stock-ledger, admissible under the ''shop-book'' rule, is some evidence that Russell, having been a part owner of the bank and as to such part ownership in ''account'' with the bank, in 1867 squared the account by ceasing to be such part owner. It was entirely possible for Russell to have become the owner of bank stock without ever receiving a certificate of stock and to sell his stock and pass title thereto without having a certificate to endorse. If, as in this case, he possessed a certificate, he might also sell and transfer title to his stock without presenting or endorsing the certificate if the bank consented to such course.

The stock-ledger with its entries in the Russell account is some evidence that in 1867 Russell ceased to own the bank stock —that in that year, the bank having had an account with Russell as a stockholder, ceased to be chargeable on this stock-account. The ledger entries are therefore probative of the bank's defense. They are, however, apparently contradicted by plaintiff's possession of what the upper court calls a ''very matter-of-fact stock certificate.''

Does this conflict of evidence leave the balance even between the litigants or outweigh on the side of the present plaintiff? This is the ultimate question in the case.

In weighing conflicting evidence, at least two considerations are proper and important. First, the probative effect of the evidence should be analyzed, and, second, the comparative reasonableness or probability of conflicting conclusions should be taken into account.

Viewing the evidence in the former aspect, the ledger entries tend to prove that Russell ceased to be to stockholder on the date of the last entry. Unless a tortious intent on the part of bank officials is assumed, no other conclusion is inferable.

On the other hand, the possession by Russell (or his administrator) of the stock certificate, has, at first glance, a probative tendency exactly the opposite. In truth, however, the retention by Russell of the certificate is not inconsistent necessarily with his having sold the stock. What is more important is that the book-entry, assuming its honesty, speaks of the ownership (or change in ownership) of the *stock itself*, whereas possession, however honest, of the certificate merely indicates, but does not necessitate the conclusion that Russell continued the owner. Plaintiff's possession of the bare *indicia* of title may be rationally accounted for on the theory of temporary loss of the certificate, but the ledger entry can only mean that the title to the stock passed, or that former officials of the bank deliberately falsified their records for no personal gain, but in a crude attempt to destroy the holdings of one stockholder for the benefit of another.

When faced by such conflicting conclusions, it is entirely proper to apply the test of reasonableness. Viewing the case from this aspect, it is easy to believe that bank officials consented to a transfer by Russell of his own stock without insisting upon a production of the stock certificate. To speak of such a course as careless or unwise is altogether just, but to brand it as a violation of law and a wrong to the stockholder presumably accommodated thereby, is to torture the sense of plain words.

Again, taking the known facts from Russell's view-point, how account for his reticence of a quarter-century, in the face of a progressive financial decline, if indeed he knew himself entitled to this valuable holding of stock. It was suggested at another stage of this litigation that it is a trick that misers have to appear to live poor while they are getting ready to die rich. Assume that Russell was a miser—an assumption that the evidence flatly contradicts—is it also a trick of misers to permit their rich dividends to lie unclaimed? Or receiving none for many years, to make no inquiry therefor?

Mere supposition or conjecture has no place in the direct processes of legal inquiry, but conclusions based on evidence are rightly tested by the inherent probabilities of the case. My conclusions from the evidence, tested by the probabilities of the present case, is that Russell's administrator holds the naked token of ownership in stock, the title to which passed to another in 1867. The certificate of stock, having long ceased to represent title, should therefore be canceled or delivered up.

Having stated, perhaps too fully, the grounds of my conclusion, I take no notice of other defenses pleaded by the defendant bank.

The petition will be dismissed, and the prayer of the cross-petition granted.